**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————————

LESTER LEE SCARBROUGH, JR.,

                                        Plaintiff,

        v.                                                      No. 10-CV-901
                                                                   (TJM/CFH)
STEVEN D. THOMPSON, Sergeant, Upstate
Correctional Facility; TIMOTHY ARQUITT,
Correctional Officer, Upstate Correctional Facility;
THOMAS SMITH, Correctional Officer, Upstate
Correctional Facility; BRIAN GARY, Correctional
Officer, Upstate Correctional Facility; BRUCE
TRUAX, Correctional Officer, Upstate Correctional
Facility; BRYAN CLARK, Correctional Officer,
Upstate Correctional Facility; PAUL BURGESS;
ROBERT H. REYNOLDS; JOHN MATEJAIK;
STEVEN SALLS; THOMAS QUINN; DONALD
QUINN; GARY GETTMANN; MARLA TRAVERS;
and DAVID ROCK,

                                        Defendants.[1]

———————————————————————————

**APPEARANCES:**                        **OF COUNSEL:**

LESTER LEE SCARBROUGH, JR.
Plaintiff Pro se
715 Spruce Avenue, Apt. #3
Niagra Falls, NY 14303


HON. ERIC T. SCHNEIDERMAN          MICHAEL G. McCARTIN, ESQ.
Attorney General for the          Assistant Attorney General
    State of New York
————————————————————

        [1] The following defendants have been identified with their job positions:  Paul
Burgess, corrections officer; Robert H. Reynolds, corrections officer; John Matejaik,
corrections officer; Steven Salls, lieutenant; Thomas Quinn, superintendent; Donald
Quinn, captain; Gary Gettmann, sergeant; Marla Travers, nurse; and David Rock,
superintendent.  Am. Compl. (Dkt. No. 37) ¶ 31; Reynolds Decl. (Dkt. No. 76-20) ¶ 2;
Matejaik Decl. (Dkt. No. 76-16) ¶ 2; Scarbrough Dep. (Dkt. No. 76-3) at 57; T. Quinn Decl.
(Dkt. No. 76-24) ¶ 2; D. Quinn (Dkt. No. 76-11) ¶ 2; Gettmann Decl. (Dkt. No. 76-12) ¶ 2;
Travers Decl. (Dkt. No. 76-18) ¶ 2; Rock Decl. (Dkt. No. 76-10) at ¶ 2.

Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

Plaintiff pro se Lester Lee Scarbrough, Jr. ("Scarbrough"), a former inmate in the

custody of the New York State Department of Correctional and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that fifteen officials and

employees of DOCCS violated his constitutional rights under the First and Eighth

Amendments.  Am. Compl. (Dkt. No. 37).  Presently pending is defendants' motion for

summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 76.  Scarbrough opposes this

motion.  Dkt. No. 82.  For the following reasons, it is recommended that defendants' motion

for summary judgment be granted in part and denied in part.

## I.  Background

The facts are related in the light most favorable to Scarbrough as the non-moving party.

See subsection II(A) infra.  At all relevant time periods, Scarbrough was an inmate at

Upstate Correctional Facility ("Upstate").  Am. Compl. ¶ 3.

## A.  Cell Flooding

On the morning of December 31, 2009, Scarbrough was flushing the toilet in his cell

---

[2]  This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

when it began to overflow.  Am. Compl. ¶ 25.  Upon Scarbrough's call out for assistance,

defendant Burgess, a corrections officer, arrived at the cell.  Id. ¶¶ 28, 31.  Despite

Scarbrough's explanation that the flooding was accidental, Burgess informed Scarbrough

that he was lodging a misbehavior report against Scarbrough for intentionally flooding the

prison gallery, resulting in the reduction of Scarbrough's Progressive Inmate Movement

System ("PIMS") Level from a 3 to a 1.  Id. ¶  32.  This required Scarbrough to move to

another cell.[3]  Id. ¶ 32; Scarbrough Dep. at 21–22.  Scarbrough refused to move before a

disciplinary hearing was conducted.  Am. Compl. ¶¶ 36, 38, 88.  Thereafter, Burgess left

Scarbrough's cell.  Id. ¶ 39.

During his deposition, Scarbrough testified to the following on the issuance of a

misbehavior report before a cell transfer:

> Q:  Isn't it true that the officers do not have to wait to have a
> misbehavior report written, and then have that misbehavior
> report acted upon before an inmate is moved from one cell
> to another?
>
> A:  They do that.  But I also seen people cash tickets and stay
> in the same cell until they are given their hearing.  And then
> they go downstairs because they were found guilty.
>
> Q:  That's the decision of the officers to make, not the inmates
> to make, though[,] correct?
>
> A:  I'm not saying that I made any decision.  I didn't do nothing
> wrong.  You know what I'm saying? . . . The people that
> came to my cell wasn't trying to hear me. . . .

---

[3]  According to Scarbrough, Upstate employs a Progressive Inmate Movement
System ("PIMS"), which categorizes inmates on a three-level merit system.  Am. Compl.
¶¶ 33–34.  Level-3 being the highest, it offers inmates various amenities that are
unavailable to lower levels.  Id. ¶ 35.  For example, a Level-3 inmate has recreation twice
a day, four showers a week, and can keep thirty books in his cell.  Scarbrough Dep. at 23.

Scarbrough Dep. at 28–29.  As to whether he refused to move out of the cell, Scarbrough

testified to the following:

> Q:  What I'm talking about is what happened.  And an officer
>     came and told you [that] you had to move out of your cell—
>
> A:  Yes.
>
> Q:  – and you refused that?
>
> A:  Yeah.  I wasn't really thinking, . . . I ain't do nothing wrong.
>
> . . .
>
> Q:  You realize that as you sit here today that the officers have
>     the right to put you in whatever cell they choose[,] correct?
>
> A:  They shouldn't . . . .
>
> . . .
>
> Q:  So . . . if you were up at Upstate and an officer told you, you
>     got to move out of your cell today, pack up, you're moving
>     out of your cell, is it your position as you sit here today that
>     you have the authority as an inmate to refuse that order? . . .
>
> A:  That's when they got to have a sergeant come to your cell.
>     And you explain to the sergeant what's going on.

Id. at 30–32.

### B.  Cell Extraction

Shortly after Burgess left Scarbrough's cell, three other officers came to Scarbrough's

cell and ordered him to voluntarily move to another cell.  Defendant Thompson, a sergeant,

entered Scarbrough's cell and told him to move to another cell because of his PIMS-level

reduction.  Am. Compl. ¶¶ 40, 42.  Regardless of Thompson's order, Scarbrough refused to

4

move and Thompson left the cell.  Id. ¶ 43.  The same exchange occurred between Scarbrough and defendant Salls, a lieutenant.  Id. ¶ 45.  Salls said to Scarbrough, "[m]ake sure you have your boots on tight because we're coming in there, mother fu**er . . . ."  Id. ¶ 46.  Finally, defendant Donald Quinn, a captain, ordered Scarbrough to exit his cell.  Id. ¶ 47.  Scarbrough remained adamant that he did nothing wrong and refused to leave his cell.  Id.

Certain DOCCS officials and employees granted authorization for the use of a chemical agent, the medical clearance for such use, and a potential cell extraction.  Defendant Rock, a superintendent, authorized Thompson to use a chemical agent on Scarbrough and to conduct a cell extraction if necessary.  Rock Decl. ¶ 5.  Donald Quinn gave Thompson the final order to use a chemical agent and conduct a cell extraction if necessary.  D. Quinn Decl. ¶ 5.  Based on Scarbrough's medical records, defendant Travers, a nurse, determined that nothing in the records showed that a chemical agent could not be used against Scarbrough.  Travers Decl. ¶ 6.  Thereafter, Travers gave medical clearance for the use of a chemical agent against Scarbrough.  Id.

Thompson returned to administer five applications of a chemical agent.  Am. Compl. ¶ 49.  Between each application of the chemical agent, Thompson repeatedly ordered Scarbrough to come to the door.  Ex. B – Handheld video (submitted with Defs.' Mot. for Summ. J.) (Dkt. No. 76-14).[4]  Before the last application, an officer remarked, "appears hiding something in his hand" and "appears to be sock with something in it."  Id.

---

[4]  Despite Scarbrough's complaints with regard to certain liberties he had while watching the videos as well as issues with identifying people in the videos, defendants satisfied the Court's text order by ensuring that Scarbrough reviewed the video recordings of his cell extraction.  Dkt. report entry dated 3/22/2012; Dkt. Nos. 84, 85.

After the last application of the chemical agent, Thompson ordered corrections officers and defendants Arquitt, Smith, Gary, Truax, and Clark to enter the cell. Am. Compl. ¶¶ 50–51. Defendant Matejaik manually opened the hatch cover to the cell door and defendant Reynolds manually opened the cell door for the correction officers to enter. Id. ¶¶ 52–53. Before entering the cell, something had to be pushed away from the door to the cell in order for the officers to enter the cell.[5] Ex. B – Handheld Video.

When the extraction team entered the cell, one of them held what resembled a broom handle. Ex. B – Handheld Video. Scarbrough alleged that he was already down, subdued, and not resisting, when the officers entered and beat him with batons, kicked him in the face, head, and back, and told him to stop litigating against the staff. Am. Compl. ¶¶ 54, 89. While he was unable to identify precisely what each officer did because he was blinded by the chemical agent, Scarbrough contends that the officer who was on the ground told him to stop filing lawsuits. Am. Compl. ¶ 60; Scarbrough Dep. at 40–41. Gary was the officer on the ground with Scarbrough. Gary Decl. ¶ 5.

The named defendants involved in the extraction identified the conduct that they carried out. As an initial matter, defendants contend that when the extraction team entered the cell, Scarbrough used a tube sock loaded with four bars of soap to strike the team.[6] Arquitt entered first, using a shield. Arquitt Decl. ¶ 2. Gary was the second officer to enter the cell and saw Scarbrough swing a weapon that struck Arquitt's shield. Gary Decl. ¶ 5; Arquitt

---

[5] Defendants identified the barrier as a mattress and a pillow. Use of Force Report (Dkt. No. 76-23) at 12.

[6] Defendants submitted a photo of the sock of soaps on the ground. Dkt. No. 76-15 at 8, 9. Defendants maintain that the sock of soaps was found on the floor near the shower in Scarbrough's cell. Dkt. No. 76-23 at 24.

Decl. ¶ 2.  Gary struck Scarbrough with a baton in the upper right forearm and Scarbrough released the weapon.[7]  Gary Decl. ¶ 5; Dkt. No. 76-23, at 2.  Arquitt grabbed Scarbrough by the shoulder area with both hands and forced him to the floor.  Dkt. No. 76-23 at 2.  Gary dropped to the floor with Scarbrough and grabbed his right shoulder.  Gary Decl. ¶ 5.  Truax grabbed Scarbrough's left shoulder with his left hand and the right shoulder with his right hand.  Truax Decl. ¶ 5.  Smith grabbed Scarbrough's left arm.  Smith Decl. ¶ 5.  Clark, the last officer to enter the cell, placed his hands on Scarbrough's left shoulder area while Scarbrough was on the ground.  Clark Decl. ¶ 5.  Gary grabbed Scarbrough's right arm with both hands and applied the handcuffs.  Gary Decl. ¶ 5.  The video does not clearly capture the events of the cell extraction, including the officers' entry and restraining of Scarbrough, all of which took approximately fifty seconds.  Ex. B – Handheld video.  However, the viewer's first sighting of Scarbrough is him already down on the ground.  Id.

Gary and Arquitt removed Scarbrough's clothes with scissors.  Gary Mem. at 1; Dkt. No. 76-23 at 12.  Clark escorted Scarbrough to the decontamination shower, then to the lower holding area for a medical examination and photos to be taken, and finally, returned Scarbrough to his cell where a retention strap was applied.  Clark Mem. at 1.

Scarbrough denies that he swung a sock of soaps against the extraction team or placed a mattress in front of the door to prevent the cell extraction.  Scarbrough Dep. at 82, 110, 162; Am. Compl. ¶ 86.  A DOCCS videotape showed that something was kicked out of the cell before the extraction team entered and something was then handed out of the cell shortly after the team entered the cell and encountered Scarbrough.  Ex. A – Corridor

---

[7]  Scarbrough maintains that he was never hit with a baton in the right arm; instead, he was hit in the back.  Scarbrough Dep. at 43.

7

Camera at 20:58, 21:35.

Scarbrough sustained a cut above his left eye-brow and bruising over his right eye as a result of the assault. Scarbrough Dep. at 45; Dkt. No. 76-19 at 2. Video evidence showed that when Scarbrough emerged from his cell, his entire face was covered with blood. Ex. B – Handheld Video. Scarbrough was bleeding and spitting up blood while undergoing decontamination in the shower. Id.

Scarbrough contends that his head was pushed against a wall with "blunt force" while the officers who cut off his clothing had also purposely cut him. Am. Compl. ¶¶ 61–62; Scarbrough Dep. at 92. Video evidence only showed that Scarbrough was held up in a stationary position against a wall while his clothing was removed. Ex. B – Handheld Video. Scarbrough felt that he was going to fall but the officers told him that they were holding him up. Id. Scarbrough complained about his foot because it was held against the wall and his fingers because they were being bent. Id. At one point, Scarbrough said that his face was bleeding because he was kicked in the face but someone responded, "nobody kicked you in the face," to which Scarbrough replied, "I know." Id.

Scarbrough was taken to a holding pen for photos to be taken by defendant Gettmann, a sergeant, as well as a medical examination administered by Travers.[8] Am. Compl. ¶¶ 63, 66. Despite his complaints regarding pains in his head and back, Scarbrough refused Travers's medical care, claiming that he had pre-existing conflicts with Travers and requested medical attention provided by another nurse. Id. ¶¶ 64, 67. Scarbrough testified that Travers should have sent him to another medical staff member for treatment and

---

[8] Scarbrough suspects that there is some sort of connection between Gettmann and Travers because Gettmann whispered something to Travers. Scarbrough Dep. at 47.

ensured that he received medical care before returning to his cell.  Scarbrough Dep. at 36–37.

Scarbrough received two misbehavior reports, one for flooding his cell and one for the cell extraction.  Scarbrough Dep. at 99.  DOCCS records noted that the incident was triggered by a denial of a sick call by a nurse because Scarbrough did not follow proper procedures and was told to sign up for sick call the following day.  Dkt. No. 76-23 at 35. Scarbrough contends that had non-party Lieutenant Durgan properly reviewed the report, the report would have showed that he called out for assistance, there were problems with the pipes at Upstate prior to the alleged over flowing, and he did not swing a weapon at the officers.  Pl.'s Response at 7.

### C.  Post-Cell Extraction

At 12:10 am the next day, Scarbrough agreed to a medical evaluation, was escorted to the outside facility Alice Hyde Medical Center ("Alice Hyde"), and was seen by non-party Nurse Atkinson.  Am. Compl. ¶ 70.  Scarbrough received approximately twenty-five stitches for a cut above his upper left eye-brow.  Id. ¶ 80.  Since the cell extraction, Scarbrough continued to experience problems with his breathing and vision as well as pains in the head, back, spine, and collar bone.  Am. Compl.  ¶ 81.

Upon Scarbrough's return to Upstate, he was assigned a cell mate.  Am. Compl. ¶ 74. Shortly after his return, Scarbrough was attacked by that cell mate after he "exhibited

complications with mental disorders." Id. ¶ 75. Scarbrough received a misbehavior report for engaging in a fight.[9] Pl.'s Response at 6.

As a result of the cell extraction, Scarbrough was sentenced to twelve months of confinement in the Special Housing Unit ("SHU")[10] and loss of good time credits. Scarbrough Dep. at 48–49. Scarbrough appealed this disciplinary hearing disposition; however, it was denied. Id. at 49–50. Scarbrough also filed grievances with regard to the cell extraction incident; however, all such grievances were denied and affirmed on appeal. Am. Compl. ¶¶ 83–84.

---

[9] Scarbrough contends that had non-party Lieutenant Anctil properly reviewed the misbehavior report, DOCCS would not have assigned him a cell mate, which presented an opportunity for the fight that ensued. Pl.'s Response at 7. Scarbrough was attempting to allege a failure to intervene claim under the Eighth Amendment. However, Scarbrough does not allege any facts indicating which defendant assigned him a cell mate or placed him in the cell with a cell mate. Further, even if Scarbrough had alleged the claim against Anctil, Anctil is not a defendant in this action. Moreover, to establish liability under a failure to intervene claim, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citations omitted). Because the record is devoid of any evidence supporting these three elements, such a speculative conclusion cannot survive a motion for summary judgment. See McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 215 n. 4 (2d Cir. 2006) ("speculation alone is insufficient to defeat a motion for summary judgment). Accordingly, Scarbrough's potential failure to intervene claim against Anctil or any defendant with respect to the cell mate assignment must fail as a matter of law.

[10] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

On January 12, 2010, between two and five o'clock in the afternoon, an unnamed sergeant came to Scarbrough's cell and told Scarbrough that the reason for the assault was partly due to his ongoing litigation and partly due to talking back at officers. Am. Compl. ¶ 85.[11]

On July 23, 2010, Scarbrough commenced this instant action. Compl. (Dkt. No. 1). On July 19, 2011, the Court granted Scarbrough's motion to amend his complaint, adding the following parties as defendants: Paul Burgess; Robert H. Reynolds; John Matejaik; Steven Salls; Thomas Quinn; Donald Quinn; Gary Gettmann; Marla Travers; and David Rock. Decision and Order (Dkt. No. 34) at 3; Am. Compl. Scarbrough seeks a declaratory judgment against defendants for violating his constitutional rights, injunctive relief in the form of both a physical and mental health medical examination, nominal damages, compensatory damages, and punitive damages. Am. Compl. ¶¶ 97–102.

## II. Discussion

Liberally construing Scarbrough's complaint, Scarbrough has alleged that: (1) defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark violated his Eighth Amendment rights by using excessive force during the cell extraction on December 31, 2009; (2) defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann violated his Eighth Amendment rights by failing to intervene to protect him from

---

[11] Here, Scarbrough attempts to allege a retaliation claim against an unnamed sergeant. However, Scarbrough does not name such a sergeant as a defendant in his amended complaint. Moreover, even if Scarbrough named this sergeant as a "John Doe," more than 120 days has passed since the filing of Scarbrough's amended complaint, the statutory limit for service of process on a defendant. FED. R. CIV. P. 4(m). Accordingly, all claims, if any, alleged against the said sergeant should be dismissed.

the use of excessive force; (3) defendant Travers violated his Eighth Amendment rights by acting with deliberate indifference when she failed to provide him with medical care; (4) defendant Burgess violated his constitutional rights solely by lodging a false misbehavior report against him; and (5) defendant Gary violated his First Amendment rights by using excessive force against him in retaliation for filing lawsuits.

Defendants contend that Scarbrough's:  (1) excessive force claims must fail because the video evidence of the cell extraction proves that no rational finder of fact would find in Scarbrough's favor; (2) failure to intervene claims must fail based on the lack of personal involvement of the named defendants; (3) medical indifference claim against Travers must fail because Scarbrough refused medical care that Travers had offered; and (4) claim that is based upon an alleged false misbehavior report is without merit.  Alternatively, defendants claim that they are entitled to qualified immunity.  Defendants do not address Scarbrough's retaliation claim against Gary.

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged

13

factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at 247–48.

## B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 829 (1970); <u>Matthews v. Armitage</u>, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  <u>Farmer</u>, 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  <u>Id.</u> "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  <u>Id.</u> at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  <u>Hudson v. McMillian</u>, 503 U.S. 1, 9–10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  <u>Gregg v. Georgia</u>, 428 U.S. 153,

14

173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the

15

severity of a forceful response." <u>Scott v. Coughlin</u>, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, Scarbrough has satisfied the objective prong of the analysis. Considering it is undisputed that as a result of the cell extraction, Scarbrough sustained a cut above his left eyebrow requiring twenty-five stitches, such an injury can be fairly classified as a serious medical need. Moreover, when viewing the facts in the light most favorable to the plaintiff, and considering how Scarbrough acquired the injuries, an issue of material fact arises with respect to the subjective prong of the analysis.

Scarbrough and the defendants posit contrary recitations of fact with regard to the cell extraction. Defendants contend that upon the extraction team's entry into the cell, Scarbrough swung a sock of soaps at them, to which Arquitt blocked with a shield. Gary then struck Scarbrough's upper right forearm in order to compel Scarbrough to release the weapon. Conversely, Scarbrough maintains that he was already down on the ground, subdued, and not resisting, when the team entered. Further, Scarbrough adamantly maintains that he did not swing any weapon at the extraction team. What is undisputed is the fact that Scarbrough emerged from the cell with a gash above one eyebrow and a bruise above the other. The video evidence does not resolve these issues of fact to the point that no rational finder of fact could find in favor of Scarbrough because the video does not show: (1) Scarbrough and what he was holding before defendants entered his cell; (2) how Scarbrough ended up on the ground; and (3) how defendants applied the restraints. This competing evidence rests on the credibility of Scarbrough on one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party leaves no choice but to credit

Scarbrough's version of the events for purposes of this motion.  See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Moreover, Scarbrough's evidence would also establish that he was weaponless and incapacitated by the chemical agents when the extraction team entered and that the use of force was unnecessary to extract Scarbrough from the flooded cell.  Despite Scarbrough's repeated refusals to voluntarily exit his cell, defendants' actions in assaulting this inmate could constitute a per se constitutional violation that could not be resolved by a motion for summary judgment.  Thus, viewing the facts in the light most favorable to Scarbrough, he has proffered sufficient evidence to raise an issue of material fact as to the subjective prong of the Eighth Amendment analysis to require resolution by a jury.  Accordingly, defendants' motion on this ground should be denied.


**2. Personal Involvement**

Defendants contend that Scarbrough failed to establish the personal involvement of Reynolds, Matejaik, Salls, Gettmann, Rock, Thomas Quinn, and Donald Quinn.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black

v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be

considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged
> constitutional violation;

> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;

> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance
> of such a policy or custom;

> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or

> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).[12]


### a.  Reynolds and Matejaik

Scarbrough contends that Reynolds opened the door, and Matejaik opened the hatch

cover, to his cell; therefore, their actions allowed for the alleged use of excessive force that

---

[12]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal
decision affected the five Colon factors which were traditionally used to determine
personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343
(DNH/GHL), 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the
Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several
district courts have done so); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175
(W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass
Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010)
(disagreeing that Iqbal eliminated Colon's personal involvement standard).  The
unpublished opinion cited supra, McCarroll v. Fed. Bureau of Prisons, is attached to this
Recommendation.

ensued. However, these claims did not involve either defendants' direct participation in the alleged constitutional violation as Scarbrough does not claim that the defendants were present during the assault such that they either directly participated in, or could have directly prevented its occurrence. Even assuming defendants remained at their positions when the extraction team entered, the record is devoid of evidence supporting the defendants' availability to intervene. Accordingly, defendants' motion on this ground should be granted.

### b. Salls

Scarbrough contends that Lieutenant Salls verbally harassed him before the extraction team entered his cell; thereby, failing to intervene to protect him from the assault that ensued. This allegation neither demonstrates that Salls directly participated in the failure to intervene to protect Scarbrough from the use of excessive force nor that Salls had knowledge of the alleged constitutional violation prior to its occurrence and failed to prevent its occurrence. While Scarbrough alleged that Salls warned him to tighten his boots in preparation for the extraction, no facts were alleged to support that Salls knew excessive force was to be used on Scarbrough during the extraction. Further Scarbrough does not allege that Salls created or allowed the continuance of any policy or custom under which unconstitutional practices occurred, was grossly negligent in his supervision of other subordinates, or exhibited deliberate indifference to his rights by failing to act on information indicating that unconstitutional acts had occurred. Moreover, a claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.

1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); <u>Shabazz v. Pico</u>, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under . . . § 1983."). Thus, Scarbrough has failed to allege the personal involvement of Salls. Accordingly, defendants' motion on this ground should be granted.

### c. Gettmann

Scarbrough contends that Gettmann failed to protect him from the use of excessive force by videotaping the cell extraction. Assuming excessive force was used on Scarbrough, because Scarbrough's claim concerned Gettmann's presence during the assault and direct failure to intervene, Scarbrough has sufficiently alleged Gettmann's personal involvement. Accordingly, defendants' motion on this ground should be denied.

### d. Rock and Donald Quinn

Scarbrough contends that both Rock and Donald Quinn failed to intervene to protect him from the use of excessive force because they were supervisors who authorized the use of chemical agents against him and a cell extraction if necessary. Such claims do not allege that Rock or Donald Quinn had directly failed to intervene to protect Scarbrough from excessive force or they knew that excessive force was to be used on Scarbrough. Further, "mere linkage in the prison chain of command is insufficient to implicate" a defendant's personal involvement. <u>Richard v. Goord</u>, 347 F.3d 431, 435 (2d Cir. 2003) (internal

citations omitted). While Scarbrough alleged that Donald Quinn ordered him to leave his cell, there is nothing in the record indicating that Donald Quinn was present for the extraction and available to intervene in the alleged excessive use of force. Accordingly, defendants' motion on this ground should be granted.

### e. Thomas Quinn

Scarbrough names Thomas Quinn as a defendant. However, because Scarbrough does not allege any facts concerning any wrongdoing against Thomas Quinn, and the record does not show otherwise, Scarbrough has failed to allege that Thomas Quinn was either directly or indirectly involved in any of the alleged constitutional violations. Even drawing all inferences in Scarbrough's favor, without having any indication of what Thomas Quinn allegedly did, or did not do, there is no way to conclude that he was personally involved in any of the complained of events. Accordingly, defendants' motion should be granted on this ground and Thomas Quinn should be dismissed as a defendant.

### 3. Failure to Intervene

Assuming none of the defendants' personal involvement defenses are granted, Scarbrough's contention that defendants Salls, Reynolds, Matejaik, Thomas Quinn, Donald Quinn, Rock, and Gettmann failed to intervene to protect him from excessive force must be addressed. Prison officials are obliged to protect prisoners from known harms. Farmer, 511 U.S. at 829. "Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer." Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citations omitted). To

establish liability, a plaintiff must demonstrate that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  Id.

Here, construing the complaint liberally, Scarbrough first contends that Salls knew or should have known that Scarbrough was to face excessive force when the extraction team was later called to remove Scarbrough from his cell because Salls warned him to tighten up his boots.  However, such a conclusory and speculative statement does not show that a reasonable person has been warned that a constitutional violation was about to occur.  In addition, there is nothing in the record demonstrating that Salls was aware that an assault was planned or had a realistic opportunity to intervene and prevent the harm when the video evidence showed that the alleged use of excessive force took place within fifty seconds.  Thus, Scarbrough's claim against Salls must fail.

Second, Scarbrough contends that because Reynolds and Matejaik opened the cell door and hatch cover to his cell, they could have intervened in the alleged excessive use of force that ensued.  However, a reasonable person carrying out the same actions would not be alerted that a constitutional violation would follow.  Moreover, assuming both defendants stayed at their positions—outside of the cell while the extraction team entered—the record does not support an inference that there was a reasonable opportunity to intervene in light of the brief extraction time of fifty seconds.  Thus, Scarbrough's claim against Reynolds and Matejaik must fail.

Third, Scarbrough contends that because Gettmann videotaped the entire cell extraction, Gettmann saw the use of excessive force and could have intervened to prevent

22

the constitutional violation from occurring.  However, in light of the number of people in the cell and the relatively short period of time of fifty seconds when the alleged excessive force was used, it is unreasonable to conclude that Gettmann was confronted with a reasonable opportunity to identify a constitutional violation in which he could have intervened. See O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d Cir. 1988) (holding that an Eighth Amendment violation does not occur for failing to intervene when the assault occurs so quickly that the defendant "had no realistic opportunity to attempt to prevent them [because the event was not] of sufficient duration to support a conclusion that an officer who stood by without trying to assist . . . became a tacit collaborator.").  Therefore, Scarbrough's claim against Gettmann must also fail.

Lastly, Scarbrough contends that because Rock and Donald Quinn authorized the cell extraction, both Rock and Donald Quinn had a reasonable opportunity to intervene on his behalf.  Similar to the reasoning above, such actions would not warn a reasonable person that a constitutional violation was about to occur.

Accordingly, defendants' motion on this ground should be granted.

### 4. Medical Indifference

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson, 503 U.S. at 9).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or

23

treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance v. Armstrong, 143 F.3d 698,  702 (2d Cir. 1998).  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, it is undisputed that Scarbrough's injuries constituted a serious medical condition since Travers offered Scarbrough medical care.  However, Scarbrough's contention that upon his refusal of Travers's care, Travers should have sought medical care on his behalf from another nurse is without merit.  First, since Scarbrough is not entitled to the treatment of his choice, it follows that he is not entitled to receive treatment from a person of his choice.  Thus, any alleged delay or interference in treatment was due to Scarbrough's own actions.  This cannot now be transformed into an Eighth Amendment claim.  Moreover, Scarbrough ultimately received medical treatment. Perez v. Hawk, 302 F.

24

Supp. 2d 9, 21 (E.D.N.Y. 2004) (citation omitted) ("treatment of a [plaintiff's] medical condition 'generally defeats a claim of deliberate indifference.'").  Such treatment was provided the following day and resolved the condition, despite Scarbrough's prior refusals.  In addition, any complaints regarding such treatment were not against Travers because she did not provide it.  Therefore, the record shows that Scarbrough has failed to establish deliberate indifference on the part of Travers.  Accordingly, defendants' motion on this ground should be granted and Travers should be dismissed from this action.

### C.  False Misbehavior Report

Construing the plaintiff's complaint liberally, Scarbrough alleged that Burgess violated his constitutional rights solely by lodging a false misbehavior report against him.  The Second Circuit has repeatedly held that the issuing of false charges by a corrections officer against an inmate does not constitute a <u>per</u> <u>se</u> constitutional violation under § 1983.  <u>Boddie v. Schnieder</u>, 105 F.3d 857, 862 (2d Cir. 1007) (citing <u>Freeman v. Rideout</u>, 808 F.2d 949, 951 (2d Cir. 1986)).  A false misbehavior report may constitute a constitutional violation when there is more such as "retaliation against the prisoner for exercising a constitutional right."  <u>Id.</u> (citing <u>Franco v. Kelly</u>, 854 F.2d 584, 588–90 (2d Cir. 1988).  Further, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in [any] constitutional violations which occur at a subsequent disciplinary hearing."  <u>Williams v. Smith</u>, 781 F.2d 319, 324 (2d Cir. 1986).  Here, because Scarbrough's claim is based solely on an allegedly false misbehavior report without alleging more wrongdoing on Burgess's part, Scarbrough's assertion against Burgess must fail as a matter of law.  Accordingly, defendants' motion on this ground should be granted.

## D. Retaliation

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson, 549 F. Supp. 2d at 214–15.  Therefore, conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).  If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Here, Scarbrough successfully meets the first element for the filing of lawsuits is a constitutionally protected activity.  Graham, 89 F.3d at 80.  Scarbrough also meets the third element because he filed a lawsuit against Upstate employees on July 28, 2009, which satisfies the temporal proximity for a causal connection.  Am. Compl. ¶ 21 (Scarbrough v. Evans, No. 09-CV-0850 (NAM) (DEP) (appeal dismissed on September 26, 2011)).  However, a genuine issue of material fact arises with the second element.  Even though Scarbrough alleged that Gary told him to stop filing lawsuits while Gary was assisting in the cell extraction, the record evidence is in dispute as to whether the excessive use of force flowed from Scarbrough's lawsuit or Scarbrough's refusal to exit his cell.  A determination of the second element cannot be clearly established, which results in an issue of credibility that is inappropriate to be decided for purposes of this motion.  Noteworthy is the fact that

defendants do not address this retaliation claim in their motion. Accordingly, Scarbrough's retaliation claim against Gary should remain.

## E. Qualified Immunity

Defendants claim that even if Scarbrough's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry must be discussed with regard to Scarbrough's Eighth Amendment excessive force and First Amendment retaliation claim. All other claims advanced in the complaint need not be reached because, as discussed supra, it has not been shown that defendants violated Scarbrough's constitutional rights.

28

There is no question that it was well-settled on December 31, 2009 that the Eighth Amendment prohibited a corrections officer from assaulting or intentionally inflicting harm on an inmate.  See Hudson, 503 U.S. at 9–10.  It was also well-settled on the same day that the First Amendment protected an inmate's right to file lawsuits.  Graham, 89 F.3d at 80.  Thus, accepting all of Scarbrough's allegations as true, qualified immunity cannot be granted to Thompson, Arquitt, Smith, Gary, Truax, and Clark for their alleged use of excessive force and Gary's alleged retaliatory conduct during the extraction.  However, defendants' motion should be granted in the alternative on this ground as to all other defendants, for all other claims.

### III.  Conclusion

For the reasons stated above, it is hereby:

1.      **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 76) be:

   A.      **DENIED** as to Scarbrough's excessive force claims against defendants Thompson, Arquitt, Smith, Gary, Truax, and Clark; AND

   B.      **GRANTED** as to all other claims and all other moving defendants and that the complaint be **DISMISSED** with prejudice as to those defendants; AND

2.      Further **RECOMMENDED** that Scarbrough's retaliation claim against defendant Gary remain in this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892

F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).


Dated:  December 12, 2012
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge